M. & E. SHINDLER, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
M. & E. Shindler, Inc. v. Commissioner
Docket No. 544-89
United States Tax Court
T.C. Memo 1992-290; 1992 Tax Ct. Memo LEXIS 304; 63 T.C.M. (CCH) 3039; May 18, 1992, Filed *304 Decision will be entered under Rule 155. Thomas J. O'Keefe, for petitioner. Marilyn Devin, for respondent. PARR
PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined deficiencies in petitioner's Federal income tax and additions to tax as follows: Tax Year Ending
Deficiency
Sec. 6661 Addition to Tax
7-31-1983
$  71,627
$ 17,907
7-31-1984
95,556
23,889
7-31-1985
138,297
34,574
7-31-1986
154,602
38,651
The issues for decision are: (1) Whether the amount of executive compensation petitioner paid to Mr. and Mrs. Shindler is unreasonable, and if so, to what extent; and (2) whether petitioner is liable for the section 6661 addition to tax for substantial understatement of tax. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation *305 of facts and attached exhibits are incorporated by this reference. Petitioner is a California corporation with its principal place of business in South El Monte, California. Mr. and Mrs. Shindler are the sole shareholders of petitioner, which was formed in 1981. Petitioner owns the franchise of a McDonald's restaurant located at 1185 Durfee Avenue, South El Monte, California (South El Monte store). The Whittier Store
In 1966 Mr. Shindler began his association with McDonald's when he worked for the owner-operators of a McDonald's restaurant. After 3 years, McDonald's offered Mr. Shindler a franchise, the Whittier store. Initially Mr. Shindler's parents owned 75 percent of the Whittier store and Mr. Shindler owned the other 25 percent. From 1969 through 1979, Mr. Shindler helped manage the Whittier store and received a draw of nearly $ 800 a month. In 1976 Mr. and Mrs. Shindler were married, and Mrs. Shindler began learning the procedures at the Whittier store. Until his death in 1980, Mr. Shindler's father was active in the Whittier store. When his father died, Mr. Shindler acquired an additional 25 percent interest. During 1982 and 1983, Mr. Shindler hired a supervisor *306 with 20 years' experience to run the store, while Mr. Shindler kept certain responsibilities himself. During 1982 and 1983 the supervisor received a salary of between $ 30,000 and $ 35,000. In 1984 when the supervisor left the Whittier store, the store manager, along with Mr. Shindler, took over the supervisor's duties. The South El Monte Store
Mr. and Mrs. Shindler wanted to open their own McDonald's, and in 1979 they were offered a franchise in South El Monte, California. The South El Monte store was considered somewhat risky, because the location did not have the usual qualities McDonald's looked for when choosing a site, such as a large residential base or large shopping area to generate business. Nevertheless, Mr. and Mrs. Shindler each put up $ 80,000, borrowed $ 290,000 jointly, and started the South El Monte store. McDonald's projected the store would generate between $ 800,000 and $ 900,000 per year in sales. In 1981 after the store opened, Mr. and Mrs. Shindler formed petitioner. Petitioner declared no dividends from 1981 through 1986. During these years Mr. and Mrs. Shindler drew salaries. The rest of the South El Monte store's net income was retained by *307 the business for expansion and remodelling. The South El Monte store was remodeled in 1982, 1984, and 1986. The 1984 remodelling increased the capacity at the South El Monte store from 80 or 90 to 180 seats. Duties of the Shindlers
Mr. Shindler officially held the title of president, while Mrs. Shindler held the title of secretary/treasurer of petitioner. However, these titles do not accurately describe the roles played by each. Mr. and Mrs. Shindler shared the work and management responsibilities. Each worked an average of 60 hours a week and at times made additional night and weekend visits. Mr. Shindler contributed 80 to 90 percent of his time to the South El Monte store, and 10 to 20 percent to the Whittier store, while Mrs. Shindler spent approximately 98 percent of her time at the South El Monte store and around 2 percent at the Whittier store. The tax returns for some inexplicable reason incorrectly designated both Mr. and Mrs. Shindler as part-time employees at the South El Monte store. Mr. and Mrs. Shindler maintained an office in their home. At home they read much of the business mail and McDonald's reading material which covered such subjects as new equipment *308 and labor practices. Additionally, they placed many business calls while at home. The Shindlers also attended meetings at which they represented both the South El Monte and the Whittier stores. While at these meetings, the additional representation of the Whittier store required little or no extra effort. Mr. Shindler, Mrs. Shindler, and the South El Monte store manager devised a list of at least 50 promotional activities, referred to as the "L.S.M. Marketing Plan." Most of the activities on the list were staged during the years in issue. If the promotions were successful at the South El Monte store, they were subsequently introduced at the Whittier store as well. Mrs. Shindler has successfully completed and kept current her McDonald's education at McDonald's own Hamburger University, at which she attended both the Beginner Operator and the Intermediate Operator courses. Mrs. Shindler has fulfilled all of the prerequisites necessary to qualify as an owner-operator of a McDonald's franchise. At the South El Monte store, Mrs. Shindler's responsibilities were commensurate with an owner-operator who is in co-charge of the business. In addition to helping manage the employees, *309 Mrs. Shindler, who has a business background, designed a cash sheet, difference report, usage report, waste report, and cash slips comparable with the computerized cash registers. With the help of these reports the areas of waste, maintenance and repair, management labor, food costs, and employee theft were reviewed monthly by Mrs. Shindler. A finding of unfavorable variances in the reports resulted in weekly, and potentially daily, review. These forms were later used at the Whittier store and even a few unrelated McDonald's. Additionally, Mrs. Shindler worked with the architect in designing and decorating the South El Monte store prior to its opening. In addition to the Shindlers, petitioner also employed a full-time manager at all relevant times, except from fall 1983 through spring 1984, while the manager recuperated from back problems. The South El Monte store also had an assistant manager and crew managers during all relevant times. During 1983 and 1984 the highest paid employee at the South El Monte store received between $ 25,000 and $ 30,000. Comparison With Similar Stores
The South El Monte store was run in an excellent manner, as shown by McDonald's own standards. *310 One standard used by McDonald's to measure the success of a particular restaurant and its operators is the profit after controllables (PAC) figure. The PAC figure represents the amount of profit earned taking into account only those expenses that are controllable. Accordingly, the PAC bears a direct correlation to how well an operator runs a store. During the years at issue McDonald's prepared illustrative profit and loss statements (illustrative statements), which show the PAC for company-owned stores experiencing different annual sales volumes. The illustrative statements profess to apply equally to both company-owned and independent franchises that are owner-operated. However, the dynamics of a company-owned store with a manager receiving a guaranteed paycheck each week and an owner-operated store are different. The South El Monte store's PAC numbers, averaging 34 to 35 percent, were higher than the average PAC numbers in the illustrative statements, which were between 30 and 32 percent during the period in issue. Additionally, the South El Monte store's sales, ranging from $ 1,721,327 in 1983 to $ 2,316,441 in 1986, were substantially higher than McDonald's original projections *311 of $ 800,000 to $ 900,000. The South El Monte store's performance is demonstrated in the following chart: Net
Net Profits [2]
Profits
Petitioner's
Before Owner
After Owner
Retained
Year
Net Sales
PAC
Compensation [3]
Compensation
Earnings
1983
$ 1,721,327
$ 594,091
$ 282,966
$  67,966
$ 128,106
1984
2,063,465
705,886
337,648
72,648
200,754
1985
2,248,724
785,850
431,975
191,975
217,668
1986
2,316,442
826,043
403,934
123,592
264,868
*312 % Net
Profits
Owner's
% Net
Before Owner
% Retained
Compensation
Sales
% PAC
Compensation
Earnings
1983
$ 107,500
12.5
36.2
76.0
167.8
107,500
1984
132,500
12.8
37.5
78.5
132.0
132,500
1985
120,000
10.7
30.5
55.6
110.3
120,000
1986
140,171
12.1
33.9
69.4
105.8
140,171
The Shindlers were referred to their accountant through other McDonald's owner-operators and the McDonald's corporate department. The Shindler's accountant represents approximately 60 McDonald's stores. Of the 60 stores, approximately 10 are corporations and the other 50 are either partnerships or sole proprietorships. The South El Monte store had the highest PAC of the 60 stores and was in the top 2 or 3 in sales volume. Approximately twice a year, the Shindlers met with their accountant to discuss officer compensation for petitioner. A written compensation policy for petitioner was instituted in 1985. [4]
*313 Based on seminars and the case of Schanchrist Foods, Inc. v. Commissioner, T.C. Memo. 1977-129, the Shindlers' accountant advised them that the percentage of compensation [5] to net sales for the South El Monte store, averaging 12 percent, was reasonable, especially in light of the store's success. Pension Plan
Petitioner instituted a defined benefit pension plan in 1985. Both the South El Monte and Whittier stores participated in and contributed to the plan. One of the purposes of setting up the plan was to entice top management and other highly experienced employees to remain at the store despite very high personnel turnover. Petitioner claimed deductions for contributions made to the defined benefit plan of $ 136,306 in the tax year ending July 31, 1985, and $ 132,179 in the tax year ending July 31, 1986. During these *314 years the plan had between 11 and 14 active participants. The plan received a favorable determination letter from the Internal Revenue Service for each year. OPINION I. Reasonableness of Executive Compensation
Petitioner deducted officer compensation of $ 215,000, $ 265,000, $ 240,000, and $ 280,342 during 1983, 1984, 1985, and 1986, respectively. During 1985 and 1986 petitioner also deducted $ 136,306 and $ 132,179, respectively, for contributions to the defined benefit pension plan. The record is not clear as to how much of the total pension contributions were attributable to the Shindlers' however, it is clear that some percentage does represent deferred compensation to them. Respondent determined in the statutory notice of deficiency that the following amounts of officer compensation were reasonable: $ 53,563, $ 56,182, $ 56,182, and $ 56,182 for 1983, 1984, 1985, and 1986, respectively. Section 162(a)(1) allows a deduction for ordinary and necessary business expenses including "a reasonable allowance for salaries or other compensation for personal services actually rendered". The section 162(a)(1) reasonable compensation requirement applies both to direct and *315 deferred compensation paid to an employee. See sec. 1.404(a)-1(b), Income Tax Regs. Accordingly, we must consider the amount of deferred and nondeferred compensation received in order to determine the reasonableness of petitioner's executive compensation paid to the Shindlers. La Mastro v. Commissioner, 72 T.C. 377, 382-383 (1979). The reasonableness of compensation is a question of fact to be determined from the record in each case. Estate of Wallace v. Commissioner, 95 T.C. 525, 553 (1990). The Ninth Circuit in Elliotts, Inc. v. Commissioner, 716 F.2d 1241 (9th Cir. 1983), affd. without opinion from remand 782 F.2d 1051 (9th Cir. 1986), set forth five factors to be considered. They are: (1) The employee's role in the company; (2) a comparison of the employee's salary with similarly situated employees; (3) the character and condition of the company; (4) whether the relationship of the employee to the corporation creates a conflict of interest with respect to the awarding of compensation, and if so, whether the level of compensation would provide a satisfactory level of return on equity for a hypothetical *316 independent investor; and (5) the internal consistency of salaries paid to all employees of the company. We will follow this methodology in determining the reasonableness of the Shindlers' salaries. While we will discuss only those factors upon which we place the greatest reliance, our conclusion is the result of evaluating all of the facts in this case. No one factor is determinative. See Estate of Wallace v. Commissioner, supra.
Employee's Role in the Company
Respondent argues that Mr. and Mrs. Shindler were only part-time employees at the South El Monte store. Respondent concludes that the Shindlers shared one job and that the one job significantly benefited both the Whittier and South El Monte stores. Petitioner argues, and we agree, that Mr. and Mrs. Shindler were the two top-level full-time employees of the South El Monte store. The Shindlers each worked at least 60 total hours a week during the years in issue. Mr. Shindler spent 80 to 90 percent of his time and Mrs. Shindler spent 98 percent of her time at the South El Monte store. The Shindlers operated the South El Monte store and not the Whittier store. While Mr. Shindler did make *317 and participate in some of the executive decisions at the Whittier store, the Whittier store was smaller, easier to run, and had less volume than the South El Monte store. The Whittier store could be, and was, run by a hired manager. Respondent argues that the Shindlers' efforts had little, if any, impact on the success of the South El Monte McDonald's because the fate of all McDonald's franchises rides on the coattails of the "McDonald's System." The South El Monte store was in an undesirable location and the McDonald's corporate people estimated that the South El Monte store would generate only around $ 800,000 or $ 900,000 in volume, yet it generated $ 1.7, $ 2.1, $ 2.25 and $ 2.3 million during the years in issue with the help of the Shindlers' extensive local marketing efforts. Furthermore, the record is abundant with examples of the Shindlers' personal dedication to the South El Monte store. Regardless of the fact that the "McDonald's System" was in place, we are convinced that the Shindlers' efforts substantially benefited the South El Monte store. External Comparisons
Section 1.162-7(b)(3), Income Tax Regs., provides in pertinent part: It is, in general, just *318 to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned.
Both petitioner and respondent provided expert testimony to establish a reasonable level of executive compensation for the Shindlers. Petitioner's expert is a vice president of the Hay Group. The Hay Group created the Hay System of ranking compensation, and has approximately 6,000 clients, of which only 30 to 50 have annual gross receipts of less than $ 2,500,000. Two of the Hay Group's clients are Taco Bell and White Castle. The Hay survey data is derived from industrial-type businesses and does not include banks, insurance companies, and hospitals. The compensation in the Hay survey data is comprised of salary and cash loans, and it does not include stock options or employee benefits. Even though the Hay Group's client base is not directly comparable to petitioner's business, we will weigh the results of the Hay method accordingly. *319 Petitioner's expert, in evaluating the Shindlers' jobs, met with the Shindlers and spoke with the manager of the South El Monte store. Petitioner's expert and two colleagues concluded that Mr. Shindler functioned as the CEO (chief executive officer), and Mrs. Shindler functioned as the CAO (chief administrative officer). However, the expert concluded that the two easily could have been equal jobs. The Hay system evaluates a job in the areas of know-how, problem solving, and accountability, arriving at a number of points for each area. Once the jobs were evaluated, a total number of Hay points were assigned to each job, 572 for Mr. Shindler and 454 for Mrs. Shindler. The Hay people next examined Hay's survey data for the years in issue and found midpoint levels of compensation for jobs with 572 and 454 points. After adjusting the midpoints with "comparatio" [6] (108 percent for Mr. Shindler and 105 percent for Mrs. Shindler) and applying a geographic ratio, the Hay system produced the following total combined executive compensation figures for the Shindlers: 1983
1984
1985
1986
Median
CEO & CAO Combined
Total
$ 208,900
$ 238,200
$ 259,000
$ 291,100
75th Percentile
CEO & CAO Combined
Total
225,300
256,200
278,000
309,800
90th Percentile
CEO & CAO Combined
Total
249,700
282,400
303,000
331,100
Actual [7]
CEO and CAO
Combined Total
215,000
265,000
240,000
280,342
*320 Respondent's expert used a marketplace approach to determine executive compensation. The marketplace approach involves defining the job performed and gathering data from all available information in the marketplace. Respondent's expert went forward under the assumption that Mr. Shindler acted as the CEO and Mrs. Shindler acted in a second tier position of corporate secretary/treasurer. Under the marketplace approach respondent's expert did not interview the Shindlers. After hearing the Shindlers' testimony, respondent's expert changed his opinion and concluded that Mr. and Mrs. Shindler probably shared the one position of chief operating officer. Despite respondent's expert's new position, the only figures *321 before us are the expert's compensation figures derived under his pretrial methodology. We will consider these figures in light of the trial testimony and weigh the results accordingly. Respondent's expert determined the maximum reasonable compensation for the Shindlers as follows: 1983
1984
1985
1986
Chief Executive
Officer
$ 144,567
$ 151,147
$ 164,390
$ 191,506
Corporate Secretary
and Treasurer
57,880
60,954
65,451
70,175
Maximum Total
Compensation [8]
202,447
212,101
229,841
261,681
Actual Combined
Total [9]
215,000
265,000
240,000
280,342
Petitioner argues that in addition to its expert's opinion, our opinion in Schanchrist Foods, Inc. v. Commissioner, T.C. Memo. 1977-129, validates the reasonableness of the Shindlers' salaries. The McDonald's in Schanchrist, like the South El Monte store, was more successful than most McDonald's and was run *322 by two owner-operators. There, the percentage of owner's compensation to net sales equaled 14 and 12, and the percentage of owner's compensation to net income before owner's compensation equaled 86 and 79. The Shindlers' ratios, which do not take into account the deferred compensation in 1985 and 1986, are lower than those in Schanchrist. Respondent argues that the Whittier store is the best comparison to the South El Monte store. For the reasons listed in our analysis of the employee's role in the company, we disagree with respondent. Character and Condition of the South El Monte Store
Respondent, relying on the McDonald's illustrative profit and loss statements, argues that the South El Monte store actually performed poorly in light of the ratio of net operating income to net sales. The McDonald's illustrative profit and loss statements are helpful, but by no means a quick answer to the multifaceted inquiry into the reasonableness of the Shindler's executive compensation. The statements carry the following caveat: Each of these items, as well as the actual accounting and operational and management methods employed by a franchise, may significantly affect profits *323 realized in any given operation. The nature of these variables and the economic discretion exercised by individual franchises renders a determination of the number of franchisees attaining a given profit level impracticable to ascertain.
The illustrative statements and the performance of the South El Monte store compare as follows: McDonald's Illustrative Profit and Loss Statements
Net Operating
PAC As a
Income as a %
Percentage
Type of Store
Year
Net Sales
of Net Sales
Net Income
of Sales
(Loss)
Average of approx. 1,305
1983
$   800,000
22.50%
(27,560)
(3.45)
domestic company-owned
stores
Average of approx. 1,305
1983
900,000
24.07 3,850 0.43 domestic company-owned
stores
Average of approx. 1,305
1983
1,100,000
26.21 70,550 6.41 domestic company-owned
stores
Average of approx. 1,305
1983
1,300,000
28.51 121,510 9.35 domestic company-owned
stores
South El Monte
1983
1,721,327
34.51 67,966 3.95 Average of approx. 1,365
1984
800,000
21.66 (31,985)
(3.99)
domestic company-owned
stores
Average of approx. 1,365
1984
900,000
22.75 (6,055)
(0.67)
domestic company-owned
stores
Average of approx. 1,365
1984
1,100,000
25.14 59,745 5.43 domestic company-owned
stores
Average of approx. 1,365
1984
1,300,000
25.63 99,255 7.64 domestic company-owned
stores
South El Monte
1984
2,063,465
34.21 72,648 3.52 Average of approx. 1,350
1985
800,000
18.89 (27,425)
(3.43)
domestic company-owned
stores
Average of approx. 1,350
1985
900,000
21.04 (928)
(0.10)
domestic company-owned
stores
Average of approx. 1,350
1985
1,100,000
24.41 54,865 4.99 domestic company-owned
stores
Average of approx. 1,350
1985
1,300,000
26.67 109,725 8.44 domestic company-owned
stores
South El Monte
1985
2,248,724
34.95 191,975 8.54 Average of approx. 1,349
1986
800,000
19.55 (33,667)
(4.21)
domestic company-owned
stores
Average of approx. 1,349
1986
900,000
21.62 (8,097)
(0.90)
domestic company-owned
stores
Average of approx. 1,349
1986
1,100,000
24.63 43,043 3.91 domestic company-owned
stores
Average of approx. 1,349
1986
1,300,000
26.72 94,183 7.25 domestic company-owned
stores
South El Monte
1986
2,316,442
35.66 123,592 5.34 *324 The sum of respondent's argument is that petitioner experienced above-average sales, and below-average profit margins due in part to the large percentage of net income channeled into petitioner's officer compensation. Petitioner counters that the high sales volume and PAC percentages of the South El Monte store support its position that the store was run in a superior fashion, thereby justifying the Shindlers' salaries. The illustrative statements do not take into account the cost of many executive decisions made by McDonald's for company-owned stores that are not made for owner-operated stores. Accordingly, the cost of this higher-level managerial advice is not reflected in the net profits of company-owned stores. Such managerial advice is reflected in the net profits of owner-operated stores, in the expense of owner's executive compensation. Regardless, we find that the net profits when compared to sales volume do appear to be low in 1983 and 1984. The level of profits in 1983 and 1984 is merely another factor to be considered, and is not a litmus test for us to find disguised dividends in the form of excessive compensation. Respondent next argues that the South El Monte *325 store's PAC percentages are artificially inflated, because the Shindlers' salaries are not included in the controllable expenses deducted to arrive at the PAC figure, but instead are deducted further down on the financial statements. The South El Monte store employed a manager in addition to the Shindlers. The South El Monte manager's salary expense is properly deducted in arriving at the PAC figure, while the Shindlers' salary expense is excluded. We find the PAC figures are correct and indicate that the South El Monte store was run very efficiently. Conflict of Interest
We next turn to the issue of ". . . whether some relationship exists between the taxpaying company and its employee which might permit the company to disguise nondeductible corporate distributions of income as salary expenditures deductible under section 162(a)(1)." Elliotts, Inc. v. Commissioner, 716 F.2d at 1246. The Shindlers were the two sole officers and shareholders of petitioner. They were responsible for setting their own compensation and declaring dividends. During the years in issue, no dividends were declared, and reasonable amounts of earnings were retained by petitioner *326 for remodelling and expansion required by McDonald's to maintain the franchise. The mere relationship of the Shindlers and petitioner and the absence of dividends does not lead to the conclusion that the amount of compensation was unreasonably high. These facts merely indicate that we must explore the situation more closely. See Elliotts, Inc. v. Commissioner, supra.
In a situation such as this, the Ninth Circuit recommends evaluating the compensation levels from the perspective of a hypothetical independent shareholder. Elliotts, Inc. v. Commissioner, supra at 1247. The theory is that an independent investor would probably not approve of the level of executive compensation if the independent investor were not receiving a reasonable return on his equity in the corporation.[10] The Ninth Circuit examined the net profits (profits less taxes and compensation paid to shareholder-employees) compared to the company's reported equity to determine whether the rate of return on equity would satisfy an independent investor. Elliotts, Inc. v. Commissioner, supra.
*327 Petitioner argues the Shindlers' entire initial investment in the restaurant ($ 160,000 cash and $ 290,000 of borrowed funds) should not be included in the equity for purposes of calculating the rate of return on equity that would satisfy an independent investor. We disagree. The South El Monte McDonald's was created with $ 450,000 equity, comprised of $ 160,000 cash invested directly by the Shindlers and $ 290,000 the Shindlers borrowed. In addition to the initial equity of $ 450,000 we must add the amount of retained earnings. The return on equity is calculated as follows: Year
Equity
Net Profits [11]
Return on Equity
1983
$ 578,106
$  67,966
11.8%
1984
650,754
72,648
11.2%
1985
667,668
191,975
28.8%
1986
714,868
123,592
17.3%
The high returns are a factor in favor of petitioner's position that the Shindlers did not use their relationship with petitioner to receive excessive *328 executive compensation. Internal Consistency of Salaries
Under this category, respondent argues that petitioner's compensation policy reveals that the Shindlers' compensation was a function of ownership and not remuneration for services. To the extent we find the Shindlers' salary unreasonable in tax years ending July 31, 1985 and July 31, 1986, we agree with respondent. Conclusion
After analyzing all of the facts and circumstances of this case, and given the extraordinary efforts of the Shindlers, and the testimony of petitioner's expert, which we found the sounder of the two, we find that the total amount of reasonable direct and deferred executive compensation for the Shindlers combined is: Tax year ending
Amount
7-31-1983
$ 215,000
7-31-1984
265,000
7-31-1985
270,000
7-31-1986
290,000
Since the record does not indicate the exact amounts of defined benefit plan contributions made on behalf of the Shindlers, we direct the parties to take them into account in the Rule 155 computation. II. Substantial Understatement of Tax
The next issue for decision is whether petitioner is liable for the section 6661 addition to tax for a substantial understatement *329 of tax. In the event the final calculations of tax in accordance with this opinion show a section 6661(b)(1) substantial understatement (the greater of $ 10,000 or 10 percent of the tax required to be shown on the return) for tax years ending July 31, 1985 and July 31, 1986, the parties disagree over whether petitioner is entitled to a section 6661(b)(2)(B)(i) reduction of the substantial understatement. Section 6661(b)(2)(B)(i) reduces a substantial understatement to the extent there is substantial authority for the tax treatment of an item. The standard for substantial authority is less stringent than a "more likely than not" standard, but more strict than a "reasonable basis" standard. Thus, a position that is arguable but fairly unlikely to prevail in court satisfies the reasonable basis standard, but not the substantial authority standard. Sec. 1.6661-3(a)(2), Income Tax Regs.Substantial authority is present only if the weight of the authorities supporting the treatment of an item is substantial in relation to the weight of the authorities supporting contrary positions. Sec. 1.6661-3(b), Income Tax Regs.
We find on this record that petitioner possessed substantial authority *330 for its tax treatment of the Shindlers' executive compensation. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. We infer this figure represents profits less taxes. ↩
3. Petitioner's statement of income and expense contain an expense item titled "Admin. Office Exp." which we have assumed exclusively contains executive compensation. The statements of Income and Expense show "Admin. Office Exp." as $ 165,000, $ 215,000, $ 240,000, and $ 280,342, respectively in 1983, 1984, 1985, and 1986. The actual amounts of executive compensation for the years in issue are $ 215,000, $ 265,000, $ 240,000, and $ 280,342, respectively. We conclude petitioner's statements of Income and Expense for the years ending July 31, 1983, and July 31, 1984, incorrectly list "Admin. Office Exp." as $ 165,000 and $ 215,000, respectively, when the correct amounts are $ 215,000 and $ 265,000, respectively.↩
4. The record does not contain the written compensation policy. However, the petition describes the policy as providing a base salary for the president and the secretary/treasurer of $ 7,500 per month to be applied against incentive compensation equal to a percentage of gross sales. The specific percentage, however, is not mentioned in the petition.↩
5. This compensation figure does not include the amount of deferred compensation attributable to the Shindlers during the years ending July 31, 1985 and July 31, 1986.↩
6. Comparatio multiplies the midpoint by a percentage between 80 and 120 to take into account factors such as the tenure and the successfulness of an executive. ↩
7. These actual executive compensation figures do not include the amounts of deferred compensation attributable to the Shindlers for 1985 and 1986.↩
8. Respondent's maximum total compensation figures are equivalent to the 95th percentile. ↩
9. See n.7, supra↩.
10. The Ninth Circuit noted in Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1247↩ n.5, and we recognize, that the situation may arise in which executive compensation is reasonable and the corporation may nevertheless experience a loss or an inadequate return on equity.
11. These figures are derived from petitioners' corrected statement of income and expenses. See note 3, supra↩.